ORIGINAL

FILED-CLERK
U.S. DISTRICT COURT

05 SEP 15 PM 2: 00

TEXAS-EASTERN

BY_____

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | Civil Action No.: 4:05cv364 |
| : | |
| v. : | **COMPLAINT** |
| : | |
| **MARK DAVID SHAPIRO, PHILIP B. MURPHY,** : | |
| **THOMAS GERALD DAHLEN, JR., ALBERT** | |
| **M. ABBOOD, and JAMES H. THATCHER,** : | |
| : | |
| Defendants. : | |
| : | |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## SUMMARY

1.      This case involves federal securities law violations by former executives of the Fleming Companies, Inc. ("Fleming"), which, prior to its bankruptcy, had been publicly traded and among the nation's largest grocery wholesalers. Defendants conducted their fraud to create the illusion that Fleming was financially strong and growing when, in fact, the company's earnings were suffering, largely because of the financial weakness and, ultimately, bankruptcy of its largest customer, Kmart Corporation. Defendants employed numerous measures, which they called "initiatives," to "bridge the gap" between Wall Street expectations and the company's disappointing actual operating results. The number and impact of the initiatives increased sharply during the fourth quarter of 2001 and the first two quarters of 2002, in the face of mounting pressure on Fleming's earnings.

2.      As part of their scheme, each Defendant was involved in obtaining bogus side letters from vendors that Fleming used to improperly accelerate accounting recognition of the vendors' up-front payments, which inflated the company's earnings.  In turn, the inflated earnings allowed Fleming to meet external analyst expectations and thereby prop up Fleming's stock price.  In addition, near the ends of the first and second quarters of 2002, Defendants Murphy and Shapiro directed or knew about (but did not correct or disclose to the public) Fleming's massive inventory purchases – occasionally of perishable and out-of-date or almost out-of-date products – solely to generate cash and volume discounts, which were recognized immediately to boost earnings.  Shapiro also directed the release of sizable accounting reserves, without justification or disclosure, which increased Fleming's fourth quarter and full year 2001 earnings.  Lastly, the Fleming Retail Group ("FRG"), under Defendant Dahlen's management, manipulated the calculation of same-store sales – an important industry performance metric – to falsely report positive same-store sales growth.

3.      The misstatements resulting from Defendants' wrongdoing were material.  The misstatements accounted for all of Fleming's reported pre-tax earnings for the fourth quarter of 2001, and accounted for approximately 43% of the company's 2001 earnings; almost 45% of Fleming's first quarter 2002 pre-tax earnings; and over 60% of Fleming's second quarter 2002 pre-tax earnings.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77u(a)] and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(e) and 78aa].

5.     Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails in connection with the transactions described in this Complaint.

6.     Venue is proper in this Court under Section 22(a) of the Securities Act [15 U.S.C. § 77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa] because certain of the acts and transactions described herein took place in the Eastern District of Texas.

## DEFENDANTS

7.     Mark David Shapiro ("Shapiro"), was Fleming's principal accounting officer and senior vice president of finance and operations during the relevant periods.  He was promoted to chief financial officer shortly before Fleming's April 2003 bankruptcy.  Earlier in his career, Shapiro was licensed as a certified public accountant in the State of New York, and had worked as an auditor for a large national accounting firm.  He was responsible for ensuring Fleming complied with generally accepted accounted principles ("GAAP").

8.     During all periods relevant here, Philip B. Murphy ("Murphy"), was vice president in charge of Fleming's wholesale procurement department.  He resigned shortly after Fleming's bankruptcy.

9.     From approximately April 2001 through the summer of 2002, Thomas Gerald Dahlen, Jr. ("Dahlen"), was president of FRG.  He left Fleming in the summer of 2002.

10.     From October 2001 through May 2002, Albert M. Abbood ("Abbood"), was a vice president in Fleming's wholesale procurement department reporting to Murphy.

11.     During all periods relevant here, James H. Thatcher ("Thatcher"), was a vice president in FRG's procurement group reporting to Dahlen.

## FACTS

12.     Fleming Companies, Inc., an Oklahoma corporation previously headquartered in Lewisville, Texas, filed Chapter 11 bankruptcy proceedings in April 2003.   Before that, Fleming's stock traded on the New York Stock Exchange and, at one time, the company was the nation's largest grocery wholesaler, with approximately 50 major distribution centers across the country, and a sizable retail grocery operator as well, with more than 100 stores throughout the Midwest and West.   Fleming's 2001 and 2002 reported revenues were approximately $15.6 billion and $15.5 billion, respectively, but its earnings in those years were relatively much smaller, with only a $23.3 million profit and an $84 million loss, respectively.   In September 2004, Fleming emerged from bankruptcy reorganized around its subsidiary, Coremark International, Inc., a convenience store distributor it acquired in June 2002.

13.     FRG is the Fleming division that conducted Fleming's retail operations.   Dahlen was president of FRG from approximately April 2001 through approximately June 2002.

### Fleming's Core Business Begins to Suffer

14.     In late 2001 and the first half of 2002, Fleming faced anticipated earnings shortfalls resulting from a series of business and financial challenges, many of which stemmed from its February 2001 agreement to be Kmart Corporation's sole supplier.   Fleming initially touted this arrangement as a major victory and substantially expanded its facilities (and debt load) to handle the new business.   Fleming hoped that this agreement and resulting expansion would provide economies of scale and greater purchasing power, which would result in greater returns for its overall wholesale business.   The Kmart arrangement, however, failed to yield the anticipated efficiencies and, when Kmart filed bankruptcy in January 2002, Fleming's future viability came under intense scrutiny.

15.     Simultaneously, Fleming's primary wholesale customer base, the small to medium-sized independent grocer, faced adversity on a number of fronts, including a depressed national economy and heightened competition from low-cost supercenter chains (such as Wal-Mart Stores Inc.) encroaching into the rural and suburban areas the independents had long dominated.  As these and other pressures drove these grocers out of business or into mergers with larger, self-supplying grocery chains, Fleming found it harder to generate its historical returns from this business.

16.     Fleming experienced other earnings pressures as well.  For instance, in late 2000 and early 2001, Fleming began centralizing many of its business functions, most prominently its procurement department.  Traditionally, Fleming's distribution centers handled most of their own procurement, which provided a substantial part of each distribution center's internal margin. By centralizing this function and purchasing on a national rather than local or regional scale, Fleming hoped to obtain better prices from vendors and thereby improve its overall margins. These benefits did not materialize and, instead, Fleming was increasingly at odds with the vendor community.

17.     FRG also pressured Fleming's bottom line.   Despite contrary public representations, FRG was not performing as well as expected.  Securities analysts referred to FRG as a "growth vehicle" for Fleming's future, based largely on the strong same-store sales figures Fleming reported during 2001.  However, these figures were misleading, as FRG's real same-store sales performance was negative.

### Fleming Relies on Improper "Initiatives" to Address Earnings Shortfalls

18.     Senior Fleming management, including Shapiro and Murphy, closely monitored Fleming's financial results as compared to the market's expectations.  When Fleming could not

generate enough revenue to meet its goals, Defendants cobbled together fraudulent initiatives to "fill the gap" between Fleming's actual and expected results.

19.     The initiatives were detailed on "initiative lists" identifying special transactions and cost-saving measures – legitimate and illegitimate – to which different Fleming departments had committed to help fill earnings gaps.   These lists identified the amount of income generated by each transaction and its impact on Fleming's earnings per share.   The initiative lists were circulated at weekly senior executive meetings – attended by Murphy and Shapiro – to track Fleming's financial progress.

20.     The wholesale procurement department bore the heaviest burden at Fleming for delivering initiatives to fill earnings gaps.   Murphy, as department head, was responsible for finding and consummating these initiatives.   Murphy's department maintained its own initiative lists, which Murphy carefully monitored and enforced.   This list detailed the initiatives contributing the vast majority of the company's projected earnings, and ultimately was "rolled up" into the company-wide initiative list prepared for senior management.   As quarters wound down, Murphy held "lock-down" meetings with his procurement team, from which no one could leave until the earnings gap was filled with initiatives.

21.     Murphy scrutinized this list and pushed his subordinates, including Abbood, to do "whatever is necessary" to fulfill the initiatives.   For instance, he regularly told his staff to get side letters linking vendor payments to past performance and describing them as "non-refundable," because Murphy contended that these "magic words" would permit immediate recognition of the full payment in earnings.   Yet Murphy knew that these payments were unrelated to any past performance but instead obtained some future right for the vendors.

22.     Thatcher headed FRG's procurement group, the retail-side equivalent to Murphy's wholesale procurement group. Like Murphy, Thatcher was under intense pressure to deliver initiatives. In response, he also obtained misleading side letters to fill Fleming's earnings gaps, instructing his subordinates, "You know the drill, structure the money so we can book it on the front side." When his subordinates questioned his methods, he snapped, "[t]he company is not asking for a vote on this one."

23.     Shapiro engaged in the sort of earnings manipulation that, as the principal accounting officer, he was supposed to prevent. He knew or recklessly ignored that Murphy's and Thatcher's groups secured misleading side letters from vendors to accelerate recognition of the vendors' up-front payments. In fact, he even stepped into stalled negotiations with vendors to "close the deal" and secure the desired side letter. He also directed or permitted improper accounting for other initiatives, sometimes overriding decisions made by lower-level accountants who questioned the documents and information provided by procurement. When procurement complained about the accountants' "meddling," Shapiro chided them to become more "operational friendly."

### Fourth Quarter 2001 Initiatives

### Vendor Side Letters

24.     Grocery industry vendors routinely pay wholesalers and retailers up-front monies to secure advantages such as favorable product positioning or exclusive supplier status. To the extent these are *future* advantages, GAAP requires the wholesaler or retailer to recognize the payments over time either as revenue or as cost-of-goods-sold offsets, rather than up-front. *See* Statement of Financial Accounting Concepts No. 5, ¶¶83-84; Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements,* Topic 13:A.3, Question 5.

25. In the fourth quarter, Defendants Shapiro, Murphy, Abbood, and Thatcher procured misleading side letters from five vendors – Food Marketing Group ("FMG"), Digital Exchange Systems, Inc. ("Dexsi"), Kraft Foods, Inc. ("Kraft"), Kemps LLC, f/k/a Marigold Foods, LLC ("Marigold"), and Frito Lay, Inc. – to inflate Fleming's earnings in violation of GAAP. Each of these letters mischaracterized the vendors' up-front payments as "rebates" or other compensation for alleged past performance. As Defendants knew or recklessly ignored, the payments actually induced some future performance by Fleming or secured some future right for the vendor.

### Food Marketing Group

26. FMG was one of Fleming's "diverters." Diverters scour the market for special deals, typically buying from other wholesale or retail companies, or from inventory liquidators, who have too much inventory of a given product and sell the excess at deep discounts to the manufacturer's list price. Diverters make money by selling to its customers at prices higher than their purchase price, but still at sharp discounts to list price.

27. In late 2001, Abbood approached FMG to try to fill some of Fleming's earnings gap. At a meeting scheduled to promote FMG's diverting capabilities, Abbood instead demanded that FMG pay Fleming $2 million to be described as a rebate based on 2001 purchases. FMG did not want to pay this amount because it did not owe Fleming any such rebate. Abbood threatened to terminate its business if FMG refused.

28. Surprised by Abbood's demands, FMG appealed to Murphy, Abbood's boss, with whom it had a long-standing relationship. Murphy, however, reiterated Abbood's demands.

29. FMG eventually agreed to pay Fleming $2 million but refused to characterize it as a rebate for 2001 purchases. FMG also required Fleming's simultaneous commitment to divert a

specified amount of product through FMG during 2002 to offset this payment. FMG insisted that Fleming guarantee the volume commitment in writing. FMG's representatives then worked with Shapiro to craft an acceptable agreement.

30.     Shapiro and FMG's CFO spent several days negotiating the structure of the arrangement. After exchanging multiple drafts, Shapiro convinced FMG to memorialize FMG's $2 million payment and Fleming's reciprocal 2002 diverting obligations in separate letters. Shapiro wanted two letters to help him conceal the true nature of the transaction from Fleming's internal accountants and external auditors.

31.     Shapiro, however, failed to convince FMG to agree to language expressly linking FMG's $2 million payment to past business between the companies. After further word-smithing, Shapiro finally persuaded FMG to accept a letter generally referring to a "rebate" and stating "We look forward to working together to achieve an even more successful 2002," language Shapiro knew would enable Fleming to immediately recognize the entire payment and withstand scrutiny by Fleming's inquiring internal accountants and external auditors. Simultaneously, the parties finalized the second letter requiring repayment of the $2 million unless Fleming sourced $100 million worth of inventory from FMG in 2002. Not coincidentally, $2 million equaled the diverting savings Fleming normally would have received on $100 million in purchases through FMG.

32.     Because the $2 million payment was linked to 2002 performance (namely, Fleming's obligation to buy at least $100 million in inventory through FMG), GAAP required Fleming to recognize this payment on a prorated basis throughout 2002. Shapiro, as Fleming's principal accounting officer and as a former CPA and auditor, knew this.

33.     Fleming, however, did not record the FMG payment as required by GAAP. To the contrary, Shapiro presented the "rebate" letter to Fleming's internal accountants and external auditors, Deloitte & Touche, to justify booking the entire $2 million immediately as an offset to Fleming's cost of goods sold ("COGS"), which increased Fleming's income by the same amount. Shapiro never showed them the second letter, which expressly linked the $2 million to Fleming's obligation to perform in the future.

34.     Shapiro's deception in the FMG transaction did not end with providing Deloitte and Fleming's internal accountants only half of the transaction documents. As part of its audit of Fleming's 2001 financial statements, Deloitte prepared "confirmation" letters addressed to various Fleming vendors (including FMG) asking them to confirm details of their 2001 transactions with Fleming. These letters went out under Fleming letterhead and were signed by Shapiro as Fleming's principal accounting officer. By signing these letters, Shapiro implicitly represented to Deloitte that the letters accurately and completely described the transactions outlined therein.

35.     The confirmation letter to FMG that Shapiro signed, however, did not accurately or completely describe the parties' transaction. This letter asked FMG to confirm that "Fleming had earned a $2 million rebate for [Fleming's] business with FMG in 2001" and that *"[t]his rebate is not connected to any future commitments made Fleming and is non-refundable."* (emphasis added). Shapiro knew when he signed this letter that these statements were untrue and not confirmable by FMG for that reason. Yet he did not advise Deloitte or the public of this fact.

36.     FMG refused to sign the audit confirmation letter because it knew that Fleming had not earned the $2 million payment in 2001, and that the payment was directly connected to Fleming's 2002 sourcing commitment. Shapiro and Murphy pressured FMG to sign the letter,

but FMG still refused.  Neither Shapiro nor Murphy ever told Deloitte why FMG refused to sign the audit confirmation.

## Dexsi

37.     Dexsi was another diverter with which Fleming did business.  Dexsi was a small company heavily dependent on Fleming's business.  Dexsi first began working with Fleming in approximately October 2001 and, over the next two months, made a substantial investment (relative to its small size) in personnel and equipment to "ramp up" for the Fleming business.

38.     To help fill the projected earnings shortfall for the fourth quarter and full year 2001, Abbood approached Dexsi demanding a $2 million payment and a letter falsely attributing the payment to past performance.  Murphy knew of and approved Abbood's actions.  Abbood threatened to pull all Fleming business from Dexsi if it refused.

39.     Knowing that the letter Fleming wanted was false, but recognizing its precarious position, Dexsi acquiesced to Fleming's demands.  In return, however, Dexsi secured Abbood's agreement to allow Dexsi to recoup the $2 million by charging Fleming a higher-than-normal price on diverting purchases.

40.     Abbood provided Dexsi two documents, respectively labeled "Letter #1 – [Fleming's] internal copy" and "Letter #2 – [Dexsi's] internal copy."  "Letter 1" described the $2 million payment as a non-refundable rebate for prior business between the companies.  This is the letter Abbood gave to Fleming internal accountants to support recording the entire $2 million immediately as an offset to COGS in the fourth quarter 2001.  However, "Letter 2" which Abbood signed at the same time as Letter 1, confirmed the recoupment agreement.  Abbood and Murphy never gave Letter 2 to Fleming's internal accountants or Deloitte.

## Kraft

41.     Kraft, one of the nation's largest food producers, was one of Fleming's largest suppliers.  During 2000 and into 2001, Fleming's relationship with Kraft suffered because Fleming assessed too many unauthorized "deductions" against Kraft invoices.  Deductions on invoices are relatively common in the industry and normally result from such things as shipments that are late or contain the wrong number or type of product.  But Kraft perceived that Fleming's deduction practices were considerably more aggressive than its competitors' and had gotten out of hand by early 2001.  In fact, by February 2001, Kraft argued the balance of unauthorized deductions totaled approximately $14 million.

42.     Kraft also was unhappy with Fleming's diverting of Kraft products.  Fleming diverted Kraft products in two ways.  First, it sourced inventory for its own sales through diverters, a practice called "inbound" diverting.  Second, it purchased large volumes of product from Kraft at special discounts, and then sold the excess amount to diverters, who sold it at below-list prices outside Fleming's normal distribution channels.   This practice is called "outbound" diverting.  For Kraft, both forms of diverting harmed the promotion of its products; vendors like Kraft typically pay wholesalers and retailers to promote their products, and these payments ordinarily are based on the volume of product purchased from the vendor.  By breaking the link between vendor and wholesaler or retailer, diverting distorted and obstructed the flow of promotional money, which vendors considered detrimental to sales to ultimate consumers.

43.     Fleming and Kraft met on several occasions during early 2001 to resolve these concerns.  Murphy attended most of these meetings, which culminated in two agreements.  First, in April 2001, the parties executed a one-year "no-divert" agreement, under which Kraft agreed to pay Fleming $7.5 million to waive certain promotional fees and to refrain from diverting Kraft

products.  Then, in June 2001, the parties agreed to a one-year "preferred vendor" agreement, under which Kraft would pay more than $10.7 million in return for Fleming's commitment to eliminate various types of deductions and fees.  The parties also agreed to resolve the millions of dollars of unauthorized deductions that Fleming had taken against Kraft invoices at that point.

44.    In December 2001, Abbood asked Kraft to accelerate payment of $1.65 million under the no-divert agreement.  Murphy knew of and approved this request.  Under the terms of the no-divert agreement, these funds were not due until the first quarter of 2002 and were subject to other criteria, such as that they would "pass through" to Fleming's retail customers to help promote Kraft products.  Kraft nevertheless agreed to make the payment in December 2001.

45.    Merely accelerating, however, the payment was not enough.  Abbood and Murphy also needed to accelerate accounting recognition of the payment to help fill the anticipated fourth quarter and full year 2001 earnings gap.  Abbood therefore prepared a letter for Kraft to sign misrepresenting that the $1.65 million was an "offset" to purported "administrative costs" under the no-divert agreement.  As Abbood and Murphy knew, there were no such costs to offset and the no-divert agreement made no provision for such offsets.  Instead, they wanted the letter solely to support Fleming's recognition of the entire $1.65 million in the fourth quarter of 2001 as an offset to COGS.

46.    Abbood and Murphy submitted the side letter to Fleming's internal accountants and Deloitte without explaining that there were no "administrative costs" to "offset" or that Fleming would not earn the funds until the first quarter of 2002.  Fleming improperly recorded Kraft's $1.65 million payment as an offset to COGS, thereby inflating the company's earnings.

### Marigold

47.     Marigold was a dairy product supplier.   In the fourth quarter of 2001, the wholesale procurement department initiative list included securing $2 million in immediately recognizable revenue or COGS offsets from Marigold.   Accordingly, one of Murphy's subordinates approached Marigold at the end of 2001 to negotiate an agreement to supply ice cream to Fleming's wholesale operations for three years in return for a $2 million up-front payment.

48.     Under GAAP, the $2 million payment could not be recognized in full immediately if it was tied to Fleming's performance under the supply agreement. Accordingly, Murphy's subordinate demanded, with Murphy's knowledge and approval, that Marigold remove the payment terms from the supply agreement and place them in a separate side letter.

49.     A draft of the side letter was brought to Shapiro for approval in December 2001. Shapiro rejected it because it failed to link the payment to past performance and, therefore, would not support recognizing the entire $2 million in 2001.   Shapiro instructed that the side letter must describe the payment as "non-refundable" and a "rebate" for 2001 purchases.

50.     Shapiro and Murphy knew Marigold did not owe Fleming a $2 million rebate for 2001 purchases; indeed, Marigold's margin for ice cream sales was only *$425,000*.  Marigold, however, eventually viewed this payment as the "ante" to obtain the supply agreement and expand its overall business with Fleming, and therefore agreed to provide a side letter describing the payment as a "non-refundable" "rebate" based on "2001 purchases."

51.     Before providing the side letter, however, Marigold required a penalty provision in the supply agreement obligating Fleming to repay the $2 million on a *pro rata* basis if Fleming failed to buy a certain volume during the agreement's term.  Fleming agreed.

52.     Marigold would not have paid the $2 million without receiving the supply agreement with the penalty provision, and Fleming would not have given Marigold the supply agreement without receiving the $2 million.  Therefore, the two were directly and inextricably linked and, under GAAP, Fleming was required to defer recognition of the $2 million payment over the supply agreement's three-year term.

53.     Fleming ignored GAAP.  Using the side letter as justification, Fleming booked the entire $2 million as on offset to COGS in the fourth quarter of 2001.

54.     As part of its audit of Fleming's 2001 financial statements, Deloitte sent Marigold a confirmation letter asking for confirmation that the $2 million payment was a "rebate" for Fleming's "actual 2001 purchases," was "not connected to any future commitments" and was "not refundable."  Like the FMG confirmation letter, Shapiro signed this letter on Fleming's behalf, despite knowing that the $2 million payment was directly connected to Fleming's commitment to perform under the Marigold supply agreement.

### Frito-Lay

55.     Frito-Lay, a subsidiary of PepsiCo Inc., is a leading snack manufacturer.  In December 2001, Thatcher and Frito-Lay negotiated an agreement that would pay Fleming for achieving certain sales targets during 2002.  The agreement included a $400,000 incentive for Fleming to set up certain new product store displays by February 2002.  Thatcher, however, wanted to recognize the $400,000 immediately to help Fleming meet its earnings shortfall.

56.     Hoping to accelerate recognition of the $400,000, Thatcher and his subordinates (at his direction) asked Frito Lay to provide a letter representing that the $400,000 payment was for "snack placement," which it did.

57.     Thatcher directed his group to submit this letter to Fleming's accounting department to support revenue recognition, but Fleming accounting rejected it, explaining that the payment could not be recognized unless it related to "past performance" and was "non-refundable." A new letter incorporating the required language was prepared and backdated to conform to the first letter and presented to Frito Lay, which signed it.

58.     Fleming accounting accepted this revised letter and booked the $400,000 as revenue. As Thatcher knew, Fleming had not earned the $400,000 before the 2001 fiscal year-end and, in fact, never earned it.

### Improper Reduction of Reserve Balances

59.     From time to time, Fleming established liabilities or contra-assets on its balance sheet for various payments it anticipated making or losses it anticipated it would incur. Under Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("FAS 5"), a company must establish such reserves for identifiable, probable and estimable risks. Any reserves that do not meet the accrual requirements of FAS 5, when identified, should be immediately released into income. However, the systematic release of reserves for the purpose of "smoothing" or inflating earnings violates GAAP.

60.     After Fleming's 2001 books closed, Fleming still faced an earnings shortfall. Shapiro instructed one of his subordinates to release accounting reserves of approximately $7.8 million. By releasing reserves, Shapiro was able to increase Fleming's earnings for the fourth quarter and year-end 2001 by the same amount.

61.     The release of these reserves was not premised upon new experience or better information, but instead was done solely to prop up Fleming's sagging earnings.  For instance, reserves for bad debts, principally from Fleming's then-struggling customer base, comprised the largest part of this release of reserves, even though there had been no improvement to these borrowers' creditworthiness (or any other change) to warrant the reduction.  To the contrary, Fleming's customer base had been crippled by the post-9/11 economic downturn and the rise of Wal-Mart's dominance in the grocery market, increasing the likelihood of default.

62.     Similarly, Shapiro, with Murphy's input, also authorized the improper release of reserves set aside to cover Fleming's expected repayment of deductions from vendor's invoices.  Historically, Fleming had relied heavily on such deductions to support its profit margins, a reliance Abbood once likened to a "heroin habit."  Indeed, Fleming had a reputation in the industry for taking extensive unauthorized deductions against vendor invoices, which strained vendor relations (such as with Kraft).  In many cases, after negotiating with the vendor, Fleming paid back some or all of the unauthorized deduction.  Fleming was obligated under FAS 5 to set up reserves at the time deductions were taken against any paybacks that were probable to occur and reasonably estimable.  Shapiro, Fleming's principal accounting officer and CPA, knew this.

63.     Deductions disputed by vendors increased sharply during the last half of 2001, as Fleming became more aggressive in deducting against vendor invoices.  By November 2001, Fleming's disputed deduction balance had ballooned beyond $60 million.  Abbood maintained a log listing the disputed deductions, which he shared with Murphy.

64.     Murphy and other procurement personnel – who were best positioned to know because of their close and constant contact with vendors – recognized it was probable that $20 million of this amount would have to be repaid.  Shapiro was specifically told on December 21,

2001 that "Phil Murphy ... anticipates that we will have $20 million in vendor paybacks in 2002 that relate to 2001 deductions. Obviously, if this is true, we have a problem in that income has been recognized in 2001 that really is not valid." Yet, as Shapiro knew, Fleming's reserve for paybacks was only $8.8 million. Rather than increase the reserve to meet these probable payback obligations, however, Shapiro authorized a *reduction* in the rate at which Fleming reserved against such paybacks. As Shapiro knew or was reckless in not knowing, these reserve reductions violated GAAP because they were not justified by the information he had. To the contrary, because the amount of paybacks was probable and reasonably estimable, Shapiro should have caused Fleming to record an additional $11.2 million of reserves for paybacks (which would have reduced Fleming's pre-tax earnings for 2001 in a like amount).

65.     Despite the materiality of these released reserves to Fleming's quarterly and annual earnings, Shapiro did not cause Fleming to disclose to investors that Fleming was reducing these reserves. *See* Accounting Principles Board Opinion No. 20, *Accounting Changes* ("APB 20") ¶ 33. In fact, Fleming actually informed securities analysts during a September 5, 2002 conference call that Fleming's "reserve practices ha[d] not changed on a historic basis at all." The failure to disclose the release of reserves was misleading because it created the impression that Fleming's earnings for the fourth quarter and full year 2001 were based upon legitimate accounting rather than brazen earnings manipulation.

### Impact on Fourth Quarter 2001 and 2001 Year-End Financial Results

66.     Together, the vendor side letters and release of accounting reserves totaled $27.05 million in the fourth quarter 2001, which exceeded Fleming's reported fourth quarter 2001 pre-tax earnings of approximately $26.9 million.

67.     Fleming's 2001 annual results likewise would have been materially different. Fleming reported pre-tax annual earnings of $62.8 million.  Had it properly accounted for the initiatives, its annual pre-tax earnings would have declined approximately 43%, to $35.75 million.

68.     Fleming included these fraudulently inflated figures in its 2001 Form 10-K, filed with the Commission on March 6, 2002.  Shapiro, as Fleming's principal accounting officer, signed the Form 10-K. These figures also were included in Fleming's press release of February 13, 2002, reporting fourth quarter and year-end 2001 financial results.  Shapiro reviewed and approved the issuance of this release.

69.     Shapiro also signed the management representation letter, dated February 13, 2002, relied upon by Deloitte as part of its audit of Fleming's 2001 financial statements.  In this letter, Shapiro certified to Deloitte that, among other things:

- Fleming's 2001 financial statements were "fairly presented in conformity with accounting principles generally accepted in the United States of America";

- "all [f]inancial records and related data" had been provided to Deloitte;

- there had "been no fraud or possible irregularities involving management or employees who have significant roles in internal control";

- the "unaudited interim financial information accompanying the consolidated financial statements for each of the quarters in the year[] ended December 29, 2001 ... has been prepared and presented in conformity with accounting principles generally accepted in the United States of America";

- there had "been no fraud or possible irregularities involving employees (other than management or those who have significant roles in internal control ...) that could have an effect on the financial statements";

- there were "no ... [o]ther liabilities or loss contingencies that are required to be disclosed by" FAS 5, except as already disclosed in the notes to the financial statements; and

- "all estimates where it is reasonably possible that the estimate will change in the near term and the effect of the change could be material to the financial statements" had been disclosed.

These representations were false, as Shapiro knew or recklessly disregarded.

## Fleming's Problems Continue in 2002

### First Quarter 2002 Initiatives

70.    Fleming's earnings pressures did not relent in 2002.  Kmart's January 2002 bankruptcy actually increased the pressure, as analysts and investors scrutinized how the company responded to Kmart's collapse.  As it approached the end of the first quarter 2002, Fleming again was falling short of analysts' expected earnings, and Defendants turned once more to improper initiatives.  Fleming's first quarter 2002 ended on April 20, 2002.

### Vendor Side Letters

### Dean Foods

71.    Dean Foods is a publicly traded dairy supplier based in Dallas.  FRG was a major Dean customer.

72.    Beginning in early 2002, Fleming and Dean began negotiating a supply agreement under which Dean would provide Fleming's retail operations with milk for three years.  Thatcher handled the negotiations for FRG.  Throughout the negotiations, Thatcher told Dean that, to receive the supply agreement, Dean would have to make an up-front payment in the $2 million range.  Ultimately, the parties agreed on a $2.5 million up-front payment.

73.    Dean would not have paid the $2.5 million but for receiving the supply agreement, and Fleming would not have given Dean the supply agreement but for the $2.5 million payment.  Reflecting this intent, earlier drafts of the supply agreement contained express

payment terms, together with a penalty clause requiring Fleming to repay Dean's up-front payment on a prorated basis should Fleming breach the agreement during its term.

74.   Toward the end of negotiations, however, Thatcher demanded that the payment provision be removed from the supply agreement and instead inserted into a separate side letter. Thatcher knew that Fleming's internal accountants (who were already suspicious of him from the Frito Lay transaction) and Deloitte would immediately recognize that the payment and the agreement were linked, thereby precluding immediate recognition of the entire $2.5 million. Thatcher provided Dean with a marked-up version of the side letter Marigold provided in December 2001. The marked-up version described Dean's payment as a "rebate" for "past performance." Thatcher knew Fleming had not earned any such rebate and that the up-front payment was consideration for the supply agreement.

75.   Dean, however, balked at providing the side letter, so Thatcher turned to Dahlen for help. Dahlen eventually convinced Dean to describe the payment as a rebate, which allowed Fleming to "take it as income" in full in the first quarter 2002. Dean remained adamant, however, that the $2.5 million payment was directly tied to the supply agreement and was not truly a "non-refundable" "rebate." Dean therefore insisted that the penalty clause – requiring prorated repayment of the $2.5 million if Fleming breached – remain in the supply agreement. Thatcher agreed. On March 20, 2002, the Dean executive handling the negotiations emailed one of Thatcher's subordinates, "The [side letter] will be signed and the money transferred as soon as we agree on the supply agreement." Dahlen then signed the supply agreement and Dean paid the $2.5 million and delivered the letter Thatcher desired.

76.   Thatcher then presented the side letter to FRG's accounting department to support recognizing the entire $2.5 million as an offset to COGS in the first quarter 2002. This

recognition violated GAAP because the payment was directly linked to Fleming's performance under the supply agreement, and was refundable in case of Fleming's breach.   Therefore, Fleming should have recognized this payment ratably over the three-year term of the supply agreement.    Thatcher, however, intentionally withheld the supply agreement from FRG accounting.

77.    After Thatcher submitted the agreement to FRG accounting, an FRG accountant asked Thatcher whether the "rebate" was connected with any other agreement.  Thatcher lied and told him it wasn't.

78.    The FRG accountant then called Dean, which forwarded him a copy of the supply agreement.  Armed with these documents and Thatcher's lack of candor, the FRG accountant brought the matter to members of Fleming's central accounting office, who then brought the matter to Shapiro in early April 2002.  They shared with Shapiro the accountant's concern that documents had been withheld from accounting and that GAAP required the $2.5 million to be recognized over the three-year term of the supply agreement.

79.    Recognizing that Fleming needed this payment to meet its quarterly numbers, Shapiro dismissed their concerns and instead admonished the accounting group not to question documents submitted by procurement.  However, from his own prior involvement in the FMG and Marigold side letters, Shapiro knew that the dual documentation of the Dean transaction was standard practice at Fleming for improperly accelerating earnings recognition of up-front payments connected with forward-looking agreements.

80.    At Shapiro's direction, Fleming recorded the entire $2.5 million payment as an offset to COGS in the first quarter 2002, which increased Fleming's pre-tax earnings for the quarter by the same amount.

81.     In May 2002, during its review of Fleming's first quarter 2002 financial statements, Deloitte stumbled across the Dean side letter and obtained a copy of the supply agreement.  Deloitte then questioned Shapiro about the dual documentation.  Shapiro reacted with feigned surprise at the two documents, as though he had not already known the full details of the transaction.  He told Deloitte he would "investigate" the matter to ascertain if the side letter and supply agreement were part of the same transaction.   He never told Deloitte that he had already been advised of the matter, that the circumstances of the two documents' preparation were highly suspicious, or that he knew that the dual documentation was part of Fleming's effort to fraudulently accelerate recognition of the $2.5 million into earnings.  Instead, he advised Deloitte a few weeks later that the side letter and supply agreement were not related.

### Marigold

82.     In early 2002, Marigold secured rights to supply FRG's Milwaukee stores with dairy products for three years, in exchange for a $400,000 up-front payment.  FRG employees directly reporting to Thatcher negotiated this arrangement.

83.     After the terms of the supply agreement were finalized, Thatcher instructed his subordinates to carve out the payment terms from the deal and secure a side letter mischaracterizing the up-front payment as compensating past performance, telling his employees in a March 2, 2002 email, "You know the drill, structure the money so we can book it on the front side."  Eventually, Marigold provided a side letter mischaracterizing the payment as "growth funding" for "past performance."

84.     As with the Dean transaction, Thatcher misled FRG accountants about this deal, representing to them that Marigold's payment was not connected to any future Fleming obligation.  On the basis of the side letter and Thatcher's misrepresentations, Fleming recorded

the entire $400,000 as an offset to COGS during the first quarter 2002, which increased Fleming's pre-tax earnings for the quarter by the same amount.

### Dexsi

85.    In April 2002, Abbood again demanded Dexsi's help to fill the anticipated first quarter 2002 earnings shortfall.    He demanded that Dexsi pay $4 million and provide a side letter describing the payment as reimbursement of "warehouse expenses" that Dexsi purportedly had incurred during the quarter.    Abbood described the payment in this fashion to avoid questions from Fleming's internal accountants and Deloitte.    Like the December arrangement, Abbood agreed to a reciprocal agreement allowing Dexsi to charge higher diverting prices to recoup its payment.

86.    As Abbood knew, Dexsi did not owe Fleming reimbursement for any "warehouse" expenses, but, fearing expulsion, Dexsi nonetheless signed the false letter, which was dated April 10, 2002.  Abbood took the letter to Fleming accounting to support recognizing the full $4 million as an offset to COGS in the quarter, which increased Fleming's pre-tax earnings for the quarter by the same amount.

87.    Murphy knew about and approved this transaction, having received an email in April 2002 alerting him to the transaction's structure, including the terms of the recoupment mechanism.

### Kraft

88.    In early 2002, Abbood began negotiating an extension of the no-divert agreement with Kraft, which was to expire in April 2002, when Fleming's first quarter ended.  Kraft agreed to pay $5.6 million to extend the no-divert agreement to December 31, 2002.  This sum was

payable in installments over the rest of the year.   The parties signed a separate extension agreement memorializing these terms.

89.    Fleming, however, needed to recognize the $5.6 million in the first quarter of 2002 to meet its quarterly earnings targets.   Therefore, shortly before the quarter ended, Murphy and Abbood met with their Kraft counterparts.   Desperate to characterize the payment in such a way that would permit immediate recognition, Abbood first requested that Kraft provide a "clear-cut rebate" to "true up" the original no-divert agreement.   Kraft, however, refused because no "rebate" or "true up" was owed under the agreement and it already had closed its 2001 books. Moreover, at the time, Kraft complained that Fleming had an approximately $4 million balance of unauthorized deductions on Kraft invoices (i.e., Fleming owed Kraft money).

90.    As Abbood continued to press Kraft unsuccessfully, Murphy finally interjected and asked Kraft to "give Al a letter that will allow him to take [the $5.6 million] to income."

91.    Kraft finally agreed to provide Abbood with the requested side letter.   Initially, Kraft provided a letter reflecting that the payment would be paid in installments, as the parties had agreed.   Abbood realized this language would preclude Fleming from recognizing the entire payment during the first quarter 2002, so he directed his Kraft counterpart to send a corrected letter that did not refer to any payment plan but only to the payment being a "non-refundable" reimbursement for a purported "shortfall" under the parties' preferred vendor agreement.   Kraft agreed and provided a revised version.

92.    Abbood provided the accounting department with this letter to support booking the entire $5.6 million as an offset to expenses in the first quarter of 2002.   He did not tell the Fleming accountants or Deloitte that the payment in fact secured an extension of the no-divert agreement.   Accordingly, relying on the false documentation Abbood provided, Fleming

recorded the entire $5.6 million as an offset to COGS in the first quarter 2002, which increased Flemings pre-tax earnings for the quarter by the same amount. This violated GAAP because Fleming should have recognized the payment on a prorated basis over the agreement's term.

93.    A few weeks after Kraft signed the side letter, Abbood began exploring the possibility of unwinding the deal, because he believed Fleming could earn more by diverting Kraft's products.    When Shapiro learned of Abbood's intentions to unwind the deal, he confronted Abbood and told him that Fleming needed the deal to make its quarterly earnings target.    He further warned Abbood that unwinding the deal would expose it to Deloitte's scrutiny, which would create trouble.    The deal therefore was not unwound.    Abbood left Fleming's employment shortly after this meeting.

<strong>Excessive Inventory Purchases</strong>

94.    Periodically, vendors offered Fleming rebates or discounted prices to induce purchases. To take advantage of these deals, Fleming would make "forward" buys (also called "block" buys). A "forward" buy is an inventory purchase that exceeds the usual quantity the purchaser normally would make, generally to take advantage of special pricing offered by vendors. For example, if Fleming normally purchased a six-week supply of a given product, it would "forward" buy, hypothetically, a ten-week supply at the special pricing.

95.    Fleming's accounting policies in the first quarter of 2002 provided that it would record the full amount of such rebates or discounts immediately in the period in which the inventory was purchased, rather than ratably as the associated inventory was sold. This policy exposed investors to the risk that Fleming could manufacture earnings simply by purchasing more and more inventory in a quarter and immediately recording the full rebates or discounts as offsets to COGS. That is precisely what happened.

96.     During the first quarter 2002, Fleming concluded it was carrying too much inventory and decided that inventory levels needed to be reduced, primarily to adjust for the lost Kmart business. The company also believed it could save money by eliminating temporary warehousing space carrying excess inventory. During a March 11, 2002 analyst call updating its earnings guidance for 2002 and 2003, Fleming announced it was reducing inventories by $65 million.

97.     As head of wholesale procurement, Murphy knew better than anyone that Fleming's existing inventories were too large. Desperate to fill the remaining earnings shortfall, however, Murphy directed his subordinates to execute a series of large "forward" buys of inventory, solely to generate discounts or rebates it could record immediately. In an April 18, 2002, email – two days before the first quarter closed – Murphy instructed his subordinates to forward buy a specific volume of inventory to fill the remaining earnings gap and thereby "bring in the 1st Quarter." Murphy's email stressed the importance of having invoices in hand before quarter-end to support immediate recognition of these rebates into earnings. Murphy therefore directed his subordinates to have vendors invoice Fleming immediately and not wait for product shipment. This instruction prompted one immediate rejection, as a vendor replied, "We cannot invoice for product that has not shipped. We feel that this would raise serious issues with our auditors and with the current climate, we do not feel like it would be a good decision." Notwithstanding this setback, Murphy's team obeyed and delivered large inventory buys that generated millions in rebates and discounts that Fleming immediately recorded as an offset to COGS.

98.     These purchases added more than $50 million of merchandise to Fleming's already bloated inventory balance and generated rebates or discounts of $5.6 million. This

inventory exceeded capacity at Fleming's warehouses, forcing the company to spend additional capital to secure temporary storage space. Nonetheless, although it had not earned all of the rebates or discounts during the quarter, Fleming immediately recorded the entire amount as an offset to COGS in the first quarter 2002, which increased pre-tax earnings by the same amount.

99.      These large inventory purchases were not made in the ordinary course of Fleming's business but, as Murphy's own email confirmed, were executed solely to manufacture earnings to meet external targets. Fleming never disclosed to investors that it was generating material earnings in the quarter through these large inventory purchases. Nor did it advise investors that these large, unnecessary inventory purchases were tying up Fleming's capital and costing the company extra warehousing costs. Ultimately, because the quantity of unnecessary inventory was so great, Fleming had to sell much of it at steep discounts, thereby harming its margins in future periods. Investors were not told of this risk, either.

100.     Shapiro knew about these forward buys and their true purpose because they were listed on the "initiative lists" he (and Murphy) reviewed at weekly senior executive meetings during late March through mid-April 2002. These buys figured prominently in these lists because they contributed to Fleming's earnings and were limited only by how much excess inventory Fleming was willing to buy. Shapiro knew that Fleming publicly had committed to reducing already bloated inventories and that big quarter-end buys of unnecessary merchandise countered this commitment. He also knew that these transactions were extraordinary and intended solely to generate earnings because of their size and the fact that ordinary inventory purchases, such as the ones Fleming made every day, would not be listed as initiatives. He further knew that these excessive inventory buys tied up Fleming's capital and expensive storage space and likely would have to be sharply discounted to sell, thus driving down future margins.

Therefore, as principal accounting officer, Shapiro was obligated to inform investors of these transactions and their impact on Fleming's financial position. He did not do so. To the contrary, Fleming's May 7, 2002 press release disclosing first quarter results, which Shapiro reviewed and approved, falsely advised the public that the company "[m]ade substantial progress on inventory reduction through consolidation of slow-moving products . . ."

### Impact on First Quarter 2002 Financial Results

101.   To fill the projected first quarter earnings shortfall, Murphy's procurement group was expected to generate $14 million worth of "new" initiatives (i.e., pre-tax tax earnings exceeding their original forecast), about one-third of the $41.2 million pre-tax earnings Fleming reported for the quarter. The Kraft and Dexsi side letters and the excess inventory buys Murphy instigated contributed $12.2 million to this figure (Murphy had already budgeted $3 million from Kraft), and thus were prominently displayed on the first quarter initiative lists circulated at senior management meetings.

102.   All told, Defendants' first quarter initiatives described totaled $18.43 million. Fleming reported pre-tax earnings of $41.2 million for the first quarter.  Had it properly accounted for the initiatives, its quarterly pre-tax earnings would have declined approximately 44.5%, to $22.77 million.

103.   These fraudulently inflated earnings figures were included in Fleming's Form 10-Q filed with the Commission on May 17, 2002.  Shapiro signed this filing as Chief Accounting Officer.  These figures also were included in the May 7, 2002 press release Fleming issued to report first quarter 2002 financial results.  Shapiro reviewed and approved this release.

104.   Shapiro also signed a management representation letter to Deloitte, dated May 7, 2002, confirming to Deloitte that the first quarter 2002 financial statements Deloitte had

reviewed were "fairly presented in conformity with accounting principles generally accepted in the United States of America." He also confirmed that Fleming had made available to Deloitte "all financial records and related data that would have a bearing on the purpose of your review." Because Shapiro knew that the Dean and Kraft transactions had been improperly recorded in the first quarter financial statements, and that Fleming had manipulated its earnings through the use of excessive purchases of unnecessary inventory, these representations were false.

### Second Quarter 2002 Initiatives

### More forward buys

105.    Fleming's earnings pressures did not relent in the second quarter of 2002.  To address the anticipated shortfall in meeting analyst expectations, Murphy directed additional forward buys of inventory (some of which was perishable and close to expiration) for the purpose of manufacturing earnings, filling Fleming's warehouses with excessive inventory. These purchases approximated $110 million and generated some $8.1 million of rebates or discounts. As it had during the first quarter 2002, Fleming immediately recorded the entire $8.1 million as an offset to COGS, thereby increasing its pre-tax earnings by this amount.

106.    As with the first quarter forward buys, these forward buys were included on initiative lists that Shapiro and Murphy reviewed at weekly executive meetings during the quarter.  These forward buys were material both in amount and earnings impact, yet Shapiro never caused Fleming to disclose them, or the liquidity risks and costs associated with them, to investors.  In fact, Fleming advised analysts during a September 5, 2002 conference call that its inventory levels rose in the second quarter primarily because of major acquisitions, such as Core-Mark, and falsely claimed only $53 million worth of forward-buys contributed to the increase.

### Dean Foods

107.   In July 2002, Thatcher secured another misleading side letter from Dean.  One of Thatcher's subordinates negotiated an extension of an inventory hauling agreement for three years, for $200,000.  Like the earlier Dean Foods' supply agreement, the initial drafts of the hauling agreement included payment terms.  Thatcher, however, insisted that Dean remove the payment provision and mischaracterize the $200,000 extension payment as "past performance." Dean complied, and this letter was used to justify recording the entire $200,000 immediately as income.

### Impact on Second Quarter 2002 Financial Results

108.   Fleming reported second quarter 2002 pre-tax earnings of $15.4 million.  The forward buys and the Dean side letter inflated this figure by over 60%.

109.   Shapiro signed Fleming's Form 10-Q for the second quarter 2002, filed with the Commission on August 27, 2002, as principal accounting officer.  The inflated figures above were included in this filing.  They also were included in Fleming's July 30, 2002 press release announcing second quarter financial results.  Shapiro reviewed and approved this release.

110.   Shapiro also signed a management representation letter to Deloitte, dated July 30, 2002, which Deloitte relied upon in connection with its review of Fleming's second quarter financial statements.  As he had in the first quarter, Shapiro confirmed to Deloitte that the second quarter 2002 financial statements Deloitte had reviewed were "fairly presented in conformity with accounting principles generally accepted in the United States of America."  He also confirmed that Fleming had made available to Deloitte "all financial records and related data that would have a bearing on the purpose of your review." Because Shapiro knew that Fleming had

manipulated its earnings through the use of excessive purchases of unnecessary inventory, these representations were false.

### Fleming Also Manipulated FRG's Same-Store Sales Figures

111.    During 2001 and the first quarter of 2002, Fleming presented FRG as a growth vehicle for the future. Grocery industry analysts took up this theme, focusing on FRG's positive same-store sales growth during this period, which is a key industry performance indicator. Fleming reported same-store sales in periodic filings with the Commission and in public earnings releases.

112.    Although there is no fixed industry standard, retailers typically calculate same-store sales by comparing a store's current period sales against its sales for the corresponding period in the prior year. Fleming followed this methodology through the end of 2000. From the first quarter of 2001 through the first quarter of 2002, however, Fleming began altering its methodology (sometimes quarter to quarter) to allow FRG to report positive same-store sales growth. Fleming, however, failed to disclose the changes to its same-store sales computations.

113.    As head of FRG, Dahlen continually monitored Fleming's internal same-store sales figures and, when Fleming's sales numbers appeared poised to tumble, added new stores and different types of stores to the same-store sales comparison. Dahlen also gauged how the numbers would vary if different types of transactions (such as diverting and even postage stamp and lottery card sales) were included as sales. At different times, Fleming included in its calculations stores open less than a full reporting period; stores under remodel; stores operated by different owners; and sometimes compared different stores if they were located "close enough."

114.    After Dahlen's arrival, Fleming "tweaked" its calculation to include stores and types of transactions previously excluded. Not coincidentally, FRG reported a same-store sales increase for the first time in years. When, in the third quarter of 2001, the "tweaked" formula no longer delivered positive numbers, Dahlen added new store types to the calculation that previously had been excluded. Dahlen implemented another change the next quarter, for the same reason. Fleming never disclosed these changes to investors or otherwise revealed that its methodology was regularly changing.    To the contrary, it continued to compare the positive figures reported in 2001 with less favorable prior period figures calculated under different methodology.

115.    Dahlen compounded these undisclosed methodology changes by instigating several financing transactions disguised as sales near quarter-end that improved FRG's same-store sales figures.    In these disguised financing transactions, Fleming provided short-term financing to fund inventory acquisitions by an "opportunity goods" vendor (such vendors buy liquidation goods at deep discounts, which it then sells to its stable of customers).    To justify recording these as sales, Fleming generated documentation reflecting its purported "purchase" of the inventory from the vendor at one price and a simultaneous "sale" of the goods to the vendor's related company at a slightly higher price. Fleming wired the "purchase" price to the vendor in return for a promissory note from one of the vendor's related company (sometimes guaranteed by the vendor) reflecting the "sale" price. The same person signed all documents on behalf of the vendor and its related company. Fleming had no role in locating either the goods or the vendor's customer. The goods remained under the vendor's exclusive control, and Fleming never bore true risks of ownership.

116.    When FRG's sales needed a boost, Dahlen instigated several of these transactions at the end of 2001 and again at the end of the first quarter of 2002.  For example, Fleming reported same-store sales growth of .7% for the fourth quarter of 2001.  Fleming achieved this deceptive growth, however, only by recording phony "sales" of more than $17 million.  But for these transactions, Fleming would have reported a same-store sales *decline* of 3%.  Dahlen understood that these were not truly sales, because, when determining the year-end FRG bonus pool, he removed them from the calculations because they were "gifts" and not real indicators of FRG's sales performance.

117.    Under GAAP, Fleming should only have recorded as interest or other revenue the "net" difference between the promissory note and the amount Fleming had wired the vendor. *See* EITF 99-19, *Reporting Revenue Gross as a Principal versus Net as an Agent.*  Had Fleming excluded these transactions from its calculations, same-store sales would have been materially worse throughout 2001 and the first quarter of 2002.

118.    In the second quarter 2002, Fleming returned to a "traditional" same-store sales calculation.  Not surprisingly, reported same-store sales promptly dropped precipitously.

### Fleming's SEC Filings on Forms S-3, S-4 and S-8

119.    Fleming filed the following registration statements with the Commission during the relevant period, registering offerings of securities to the public:

| Form type | Initial Filing date |
|-----------|---------------------|
| S-8 | June 6, 2002 |
| S-3 | April 24, 2002 |
| S-4 | July 11, 2002 |

Fleming also filed with the Commission amendments to certain of these registration statements. Shapiro signed each of these filings as Fleming's principal accounting officer. Each filing expressly incorporated by reference the materially false and misleading 2001 Form 10-K, and the Forms S-8 and S-4 also incorporated Fleming's materially false and misleading first quarter Form 10-Q.

### Fleming Files Bankruptcy

120.    Fleming ultimately could not sustain the illusion that the Defendants' initiatives helped create. In January 2003, Kmart fired Fleming as its supplier, leaving the company with severe liquidity problems. A few months later, Fleming filed Chapter 11 bankruptcy.

### FIRST CLAIM
### Violations of Securities Act Section 17(a)

121.    Paragraphs 1 through 120 are realleged and incorporated by reference.

122.    Defendants Shapiro, Murphy, Abbood, and Thatcher, in the offer or sale of securities, have:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

123.    Defendants Shapiro, Murphy, Abbood, and Thatcher engaged in the conduct described in this claim knowingly or with severe recklessness. In addition, Defendants Shapiro, Murphy, Abbood, and Thatcher were negligent as they engaged in the conduct described in this claim.

124.    By reason of the foregoing, Defendants Shapiro, Murphy, Abbood, and Thatcher violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q].

## SECOND CLAIM
### Violations of Exchange Act
### Section 10(b) and Rule 10b-5

125.    Paragraphs 1 through 120 are realleged and incorporated by reference.

126.    Defendants Shapiro, Murphy, Abbood, and Thatcher, in connection with the purchase or sale of securities, have:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

127.    Defendants Shapiro, Murphy, Abbood, and Thatcher engaged in the conduct described in this claim knowingly or with severe recklessness.

128.    By reason of the foregoing, Defendants Shapiro, Murphy, Abbood, and Thatcher violated, and unless enjoined, will continue to violate Section 10(b) of the Exchange Act.  [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM
### Violations of Exchange Act
### Section 13(b)(5) and Rules 13b2-1 and 13b2-2

129.    Paragraphs 1 through 120 are realleged and incorporated by reference.

130.    Defendants Shapiro, Murphy, Abbood, and Thatcher violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] by knowingly circumventing or knowingly failing to implement a system of internal accounting controls at Fleming, or knowingly falsifying

Fleming's books, records or accounts.  Additionally, Defendants Shapiro, Murphy, Abbood, and

Thatcher violated Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1] by, directly or indirectly,

falsifying or causing to be falsified, the books, records or accounts of Fleming subject to Section

13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].  Furthermore, Defendants Shapiro,

Murphy, Abbood, and Thatcher violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2] by

making, or causing to be made, materially false or misleading statements or omissions to an

accountant or auditor.

131.    Unless enjoined, Defendants Shapiro, Murphy, Abbood, and Thatcher will

continue to violate these provisions.

### FOURTH CLAIM
### Aiding and Abetting Fleming's Violations of
### Exchange Act Section 10(b) and Rule 10b-5

132.    Paragraphs 1 through 120 are realleged and incorporated by reference.

133.    Based on the conduct alleged herein, Fleming violated Section 10(b) of the

Exchange Act and Rule 10b-5 by filing materially misleading annual and quarterly reports with

the Commission and by making public misrepresentations resulting from the improper revenue

recognition, misrepresentations and omissions, and schemes and fraudulent courses of business.

134.    Defendants Shapiro, Murphy, Dahlen, Abbood, and Thatcher, in the manner set

forth above, knowingly or with severe recklessness provided substantial assistance to Fleming in

connection with its violations of Section 10(b) and Rule 10b-5.

135.    By reason of the foregoing, Defendants Shapiro, Murphy, Dahlen, Abbood, and

Thatcher aided and abetted Fleming's violations of, and unless restrained and enjoined, will aid

and abet further violations of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule

10b-5  [17 C.F.R. §§ 240.10b-5].

## FIFTH CLAIM
### Aiding and Abetting Fleming's Violations of Exchange Act
### Section 13(a) and Rules 12b-20, 13a-1 and 13a-13

136.    Paragraphs 1 through 120 are realleged and incorporated by reference.

137.    Based on the conduct alleged herein, Fleming violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

138.    Defendants Shapiro, Murphy, Dahlen, Abbood, and Thatcher, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Fleming, as an issuer of a security registered pursuant to Section 12 of the Exchange Act, in its failing to file with the Commission, in accordance with rules and regulations the Commission has prescribed, information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the Commission has prescribed.

139.    By reason of the foregoing, Defendants Shapiro, Murphy, Dahlen, Abbood, and Thatcher aided and abetted Fleming's violations of, and unless restrained and enjoined, will aid and abet further violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

## SIXTH CLAIM
### Aiding and Abetting Fleming's Violations of Exchange Act
### Sections 13(b)(2)(A) and 13(b)(2)(B)

140.    Paragraphs 1 through 120 are realleged and incorporated by reference.

141.    Based on the conduct alleged herein, Fleming violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

142.    Defendants Shapiro, Murphy, Dahlen, Abbood, and Thatcher, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Fleming in connection with its failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected Fleming transactions and dispositions of its assets.

143.    Defendants Shapiro, Murphy, Dahlen, Abbood, and Thatcher, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Fleming in connection with its failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

144.    By reason of the foregoing, Defendants Shapiro, Murphy, Dahlen, Abbood, and Thatcher aided and abetted Fleming's violation of, and unless restrained and enjoined, will aid and abet further violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(A)].

## **REQUEST FOR RELIEF**

For these reasons, the Commission respectfully requests that the Court enter a judgment:

(a)     permanently enjoining Shapiro, Murphy, Abbood, and Thatcher from violating Section 17(a) of the Securities Act,  and violating and aiding and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2) (B), and 13(b)(5) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-13, 13b2-1, and 13b2-2 thereunder;

(b)     permanently enjoining Dahlen from violating and aiding and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder;

(c)     ordering Shapiro, Murphy, Abbood, and Thatcher to disgorge all ill-gotten gains, with prejudgment interest;

(d)     ordering Shapiro, Murphy, Abbood, and Thatcher to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78uA];

(e)     ordering Dahlen to pay a $100,000 civil penalty under Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78uA];

(f)     prohibiting Shapiro, Murphy, Abbood, and Thatcher, under Section 20(e) of the Securities Act [15 U.S.C. § 77t(d)(4)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78l], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(g)    granting such other relief as this Court may deem just or appropriate.

Dated: September 15, 2005                    Respectfully submitted,


Steve Korotash
Oklahoma Bar No. 5102
(Attorney-in-Charge)
Attorney for Plaintiff
SECURITIES and EXCHANGE COMMISSION
801 Cherry St., 19th Floor
Fort Worth, Texas 76102
Office:  (817) 978-6490
Fax:     (817) 978-2700


Of Counsel:
Stephen Webster
Texas Bar No. 21053700
David L. Peavler
Texas Bar No. 00784738
James E. Etri
Texas Bar No. 24002061
SECURITIES and EXCHANGE COMMISSION
801 Cherry St., 19th Floor
Fort Worth, Texas 76102