IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION** | § § § | |
| | § | Civil Action No. 4:05cv364 |
| V. | § | (Judge Schneider/Judge Bush ) |
| | § | |
| **MARK DAVID SHAPIRO, ET AL.** | § | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendant Mark Shapiro's Motion to Dismiss pursuant to FED. R. CIV. P. Rules 9(b) and 12(b)(6). (Docket No. 15). Defendant James Thatcher joined in Shapiro's motion. (Docket No. 17). Having considered the motions, Plaintiff's Response, and Defendants' Reply, the Court is of the opinion that the motions should be denied.

HISTORY

Fleming Companies, Inc. ("Fleming"), was a wholesale food distributor and publicly traded corporation headquartered in Lewisville, Texas. At one time, Fleming was the nation's largest grocery wholesaler with approximately 50 major distribution centers across the country. In January 2003, K-Mart, Fleming's largest customer, terminated Fleming as its supplier. A few months later, Fleming filed Chapter 11 bankruptcy.[1]

On September 15, 2005, the SEC filed this action alleging violations of the securities

---

[1] According to Plaintiff's Response, on September 15, 2004, Fleming settled commission charges that it violated the anti-fraud, reporting, record-keeping, and internal controls provisions of the securities laws. In addition, ten other vendors have settled charges that they helped Fleming misstate its financials. (Pl's Resp. p. 1).

laws. The SEC alleges that due to various economic pressures, Fleming overstated its earnings in 2001 and the first two quarters of 2002. The SEC asserts six claims in violation of the Securities and Exchange Acts: (1) section 17(a), (2) section 10(b) and Rule 10b-5, (3) section 13(b)(5) and Rules 13b2-1 and 13b2-2, (4) Aiding and Abetting Fleming's violations of section 10(b) and Rule 10b-5, (5) Aiding and Abetting Fleming's violations of section 13(a) and Rules 12b-20, 13a-1 and 13a-13, and (6) Aiding and Abetting Fleming's violations of sections 13(b)(2)(A) and 13(b)(2)(B).

Defendant Thomas Dahlen settled the SEC's claims against him. Defendants Albert Abood and Philip Murphy have submitted settlement offers and the Court has been advised that the parties are in the final stages of settlement negotiations.

Defendants Shapiro and Thatcher argue the SEC's fraud allegations, in the totality, fail to meet the rigorous pleading standard imposed by Rule 9(b). Defendants also argue Plaintiff fails to state a claim for relief under FED. R. CIV. P. Rule 12(b)(6). Specifically, Defendants assert:

(1) the section 17(a) claim fails to show Defendants were offerors or sellers of securities;

(2) the sections 17(a) and 10(b) and Rule 13b2-2 claims fail to establish materiality

(3) the sections 17(a) and 10(b) claims cannot be premised on the Exchange Offering for failure to show misstatements were made in connection with such offering; and

(4) the sections 10(b) and 17(a)(1) claims lack allegations to support scienter.

## RULE 9(b) STANDARD

It is well settled that fraud must be pleaded with particularity. *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 877 n. 24 (5th Cir.1984); *accord*, *Bobby Jones Garden Apartments, Inc. v. Suleski*, 391 F.2d 172 (5th Cir.1968); *Rubens v. Ellis*, 202 F.2d 415, 417 (5th

Cir.1953). "What constitutes 'particularity' will necessarily differ with the facts of each case...." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir.1992). At a minimum, Rule 9(b) requires allegations of the particulars of time, place, the contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. *Benchmark Elecs., Inc. v. J.M. Huber Corp.* 343 F.3d 719, 724 (5th Cir. 2003); *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993).

## RULE 12(b) STANDARD

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir.1982). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Rosenzweig v. Azurix* Corp., 332 F.3d 854, 865 (5th Cir. 2003); *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir.1986). The district court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## ANALYSIS

### Fraud with Particularity:

In securities fraud actions, Rule 9(b) requires a plaintiff to set forth specific facts that support an inference of fraud. *Tuchman v. DSC Comms. Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994). Defendants argue that the SEC's fraud allegations, in the totality, fail to meet the rigorous pleading standard imposed by Rule 9(b). The SEC argues the Complaint describes in great detail

how Defendants devised numerous measures called "initiatives" to "bridge the gap" between Wall Street expectations and the company's disappointing operating results.[2]

The Complaint, in pertinent part, alleges the following:

*Food Marketing Group ("FMG")*

FMG was one of Fleming's 'diverters.' Diverters buy inventory at deep discounts and re-sell to customers for higher but still discounted rates. Fleming wanted a $2,000,000 payment from FMG to be reflected as a rebate based on 2001 purchases. FMG balked. After pressure from Shapiro, FMG agreed to two letters. The first letter referred to a rebate and the prospects of 'achieving an even more successful 2002.' This letter enabled Fleming to immediately book the $2,000,000 payment. The second letter required repayment of the $2,000,000 unless Fleming sourced $100,000,000 worth of inventory from FMG in 2002.

As part of an audit, Shapiro signed off on a letter Fleming sent to FMG 'confirming' the nature of the transaction. FMG refused to the sign the letter because it knew the $2,000,000 had not been earned in 2001. (Compl. ¶¶ 30-36).[3]

*Marigold*

Marigold was a dairy product supplier. At the end of 2001, Fleming's wholesale procurement department approached Marigold to negotiate an agreement to supply ice cream for three years in return for payment of $2,000,000 upfront.[4] Fleming convinced Marigold to

---

[2] The SEC's Complaint details each scheme as it related to FMG, Marigold, Dexsi, Frito-Lay, and Kraft. The Court will address the allegations as they relate to Shapiro and Thatcher.

[3] Fleming was involved in another diversion agreement with Kraft Foods worth $5,600,000. Although not identical, the scheme is spelled out in the Complaint. Shapiro is alleged to have had knowledge of such agreement which was primarily contrived by Murphy and Abbood.

[4] According to the SEC, GAAP does not allow payments which are pursuant to a supply agreement to be immediately recognized in full.

remove the payment terms and draft a separate side letter.[5] Shapiro rejected the side letter because it failed to recognize the entire sum in 2001. Shapiro demanded the side letter be described as "non-refundable" and a "rebate" for 2001 purchases. Before approving this side letter, Marigold inserted a penalty provision for repayment of the $2,000,000 if Fleming failed to buy the agreed volume.[6] Shapiro also signed another 'confirmation letter' Fleming sent to Marigold.

In early 2002, some of Thatcher's employees negotiated a similar agreement with Marigold for $400,000. Thatcher allegedly told his employees "You know the drill, structure the money so we can book it on the front side." (Compl. ¶¶ 47-54, 82-84).

*Frito-Lay*

Thatcher and Frito-Lay negotiated a $400,000 incentive agreement that would pay Fleming for achieving certain sales goals in 2002. Thatcher persuaded Frito-Lay to provide a letter representing that the $400,000 was for 'snack replacement.' Fleming's accounting department rejected the letter saying it could not recognize revenue unless it related to 'past performance' and was 'nonrefundable.' A new letter was drafted and signed. However, the $400,000 was not earned before 2001 and, in fact, was never earned. (Compl. ¶¶ 55-58).

*Dean Foods*

Dean Foods ("Dean") is a dairy supplier. Thatcher negotiated a supply agreement with

---

[5] According to the Complaint, grocery vendors pay wholesalers and retailers upfront monies to secure advantages such as favorable product positioning or exclusive supplier status. To the extent these are future advantages, the GAAP requires the wholesaler or retailer to recognize the payments over time either as revenue or as cost-of-goods sold offsets. Defendant Murphy was the Vice President in charge of Fleming's wholesale procurement department and the Complaint alleges Murphy was responsible for procuring this side letter.

[6] The SEC alleges Marigold would not have paid the money without the penalty provision and Fleming would not have given Marigold the supply agreement without upfront payment.

Dean for an upfront payment of $2,500,000. Toward the end of negotiations, Thatcher convinced Dean to remove the payment terms and attach them in a side letter. Dean insisted that a penalty clause remain in the agreement. Thatcher presented only the side letter to the Fleming Retail Group accountants ("FRG"), not the supply agreement. When asked if the letter was related to any other agreement, Thatcher said it was not. Dean then actually forwarded the supply agreement to FRG. FRG went to Shapiro expressing concern for Thatcher's actions and the method used to recognize the income. Shapiro dismissed their concerns and instructed the accounting group not to question documents submitted by procurement. Shapiro then directed Fleming to record the entire amount as an offset in the first quarter of 2002. When external auditors, Deloitte & Touche, questioned the matter, Shapiro said he would 'investigate the matter' as if he was not already aware. He later told Deloitte the side letter and the supply agreement were not related. (Compl. ¶¶ 71-81).

*Reduction in Reserve Balances*

The Complaint alleges that at the close of 2001, Fleming faced an earnings shortfall. Shapiro directed the release of reserve balances by the same amount as the shortfall.[7] Shapiro also authorized the release of reserves to cover Fleming's expected repayment of deductions from vendor invoices. In December 2001, Shapiro was specifically informed Fleming was expected to have $20,000,000 in vendor paybacks related to 2001 deductions. Rather than increasing the reserves to meet these impending obligations, Shapiro authorized a reduction in the rate at which Fleming reserved against such paybacks. In a September 5, 2002 conference call, Fleming stated "its reserve practices ha[d] not changed on a historic basis at all." (Compl.

---

[7]Under State of Financial Accounting Standards No. 5, Accounting for Contingencies, a company must establish such reserves for identifiable, probable, and estimable risks.

¶¶ 59-65).

*Excessive Inventory Purchases*

During 2002, Fleming concluded it was carrying too much inventory. The company continued to face earnings shortfalls. Fleming employees were directed to execute forward buys of inventory to generate rebates and discounts that were recorded immediately.[8] When one vendor was approached, the vendor replied, "[w]e cannot invoice for product that has not shipped...this would raise serious issues with our auditors..." However, some vendors agreed. These purchases ultimately added more than $50,000,000 worth of inventory. Shapiro had already publicly committed to reducing inventories and such big quarter-end buys of inventory contradicted his statement (not to mention the additional resources required to take on such inventory). Knowing this, Shapiro, in a May 7, 2002 press release, reviewed and approved a statement purporting that Fleming "[m]ade substantial progress on inventory reduction..." Again, in the second quarter of 2002, these forward buy purchases totaled approximately $110,000,000. In a September 5, 2002 conference call, Shapiro explained that inventory levels rose in the second quarter primarily because of major acquisitions and only claimed $53,000,000 worth of forward buys. (Compl. ¶¶ 94-100, 105-106).

*Specificity as to Shapiro and Thatcher*

Shapiro was the principal accounting officer and Senior Vice President of Finance and Operations during all relevant periods.[9] The Complaint addresses Shapiro's multi-level

---

[8] A 'forward buy' is an inventory purchase that exceeds the usual quantity the purchaser normally would make to take advantage of special pricing. The Complaint alleges these forward buys were primarily encouraged at Defendant Murphy's direction.

[9] The SEC also notes that Shapiro is a former employee of a national accounting firm.

involvement in the accounting fraud scheme. [10]  Thatcher was Vice President in charge of procurement of FRG.  The Complaint asserts he was involved in the vendor side letter scheme and the deception of Fleming's accountants.[11]  Thatcher invoked his 5th Amendment rights against self-incrimination and did not testify in the Commission's investigation of this matter.

Based on the foregoing, the Court finds the SEC's forty-one (41) page Complaint is sufficient to meet the heightened pleading standard imposed by Rule 9(b).  The Complaint does not make bare allegations of conclusory facts, rather it specifically sets forth what Fleming's rebate and incentive arrangements with its suppliers were, as well as who participated in and had knowledge of these arrangements.

**Lack of Sufficient Facts**:

Offeror/Seller Under Section 17(a):

Defendants argue that the Complaint does not allege facts that, if proven, would show that Defendants were involved in "the offer or sale" of securities or that they personally solicited any person who bought or sold Fleming securities.  The SEC argues that liability under section 17(a) can be imposed on any person who participates in the alleged fraudulent activity.  The SEC alleges Defendants' schemes led to the misstatements and omissions.  Those misstatements and omissions were then included in Fleming's 2001 Form 10-K, Form 10-Qs and several Form 8-Ks.  All of these Forms were incorporated into the Registration Statements.

Section 17(a) of the Securities Act states in part:

---

[10] The Court notes that Shapiro was referenced 92 times in the Complaint.

[11] The Court notes that Thatcher was referenced 50 times in the Complaint.

> It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
>
> 15 U.S.C.A. § 77q(a) (2005).

Defendants rely on the language in section 12(a) of the act which provides: "[a]ny person who...offers or sells a security" in violation of the registration provisions of the Securities Act "shall be liable...to the person purchasing such security from him...," thus defining the class of defendants who may be subject to liability as those who offer or sell unregistered securities. *Pinter v. Dahl*, 486 U.S. 622, 641-42 (1988). The SEC argues Defendants' contention ignores the Act's plain language and that the scope of section 17(a) is much different in that it prohibits "*any person involved in the offer or sale of any securities*."

The question really is whether the similar definitions of "offer" and "sale" in sections 12 and 17 also restrict liability for section 17 claims to the same individuals and entities who could be found liable under section 12. Defendants argue that the Fifth Circuit's decision in *SEC v. Meadows* 119 F.3d 1219 (5th Cir. 1997), "confirmed" that these words are interpreted consistently under section 12 and section 17 of the Securities Act. While the Fifth Circuit did note that it was proper look to *Pinter,* the Court specifically stated that it would not interpret the question of whether the language of section 17(a) encompassed more than just offerors or

9

sellers. *Id.* at 1225 n. 9.

The statutes imposing liability under sections 12 and 17 are not identical. *See S.E.C. v. Morris*, 2005 WL 2000665, n. 5 (S.D. Tex. 2005). Although little case law exists on this precise question, the Fifth Circuit recognized the Supreme Court's unanimous decision in *Naftalin*, which interpreted section 17(a) expansively. *Meadows*, 119 F.3d at 1225 n. 7, *citing United States v. Naftalin*, 441 U.S. 768, 773 (1979); *See also Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 573 (1995) (approving of and relying on *Naftalin's* broad interpretation of section 17(a)). The Court held that the language of section 17(a) "does not require that the fraud occur in any particular phase of the selling transaction..and that, "[t]he statutory terms [offer and sale], are expansive enough to encompass the entire selling process..." *Id., (see also, Morris,* 2005 WL 2000665, at n. 6) (stating that other cases under section 17(a) do not specifically hold that a defendant must either own the security offered or sold or actively participate in the offer or sale) *citing Whitworth*, 2000 U.S. App. Lexis, n. 6 (Under section 17(a) [and other antifraud provisions], liability arises where offering materials to prospective investors contain materially false or misleading statements, including omission of material facts."); *SEC v. Softpoint*, 958 F. Supp. 846, 862 (S.D.N.Y. 1997) (noting that signing public filings, preparing and disseminating press releases and reports "fall unmistakably within the broad scope" of 17(a) and other antifraud provisions) *citing SEC v. Benson*, 657 F. Supp. 1122, 1130 (S.D.N.Y. 1987) (ruling that omissions and misstatements about a corporation's income in securities registration statements violated section 17(a)).[12]

---

[12]The statutory terms, which Congress expressly intended to define broadly, *see* H.R.Rep.No.85, 73d Cong., 1st Sess., 11 (1933); 1 Loss 512 n. 163; cf. *SEC v. National Securities, Inc.*, 393 U.S. 453, 467 n. 8 (1969), are expansive enough to encompass the entire selling process, including the seller/agent transaction. *Naftalin*, 441 U.S. at 773.

In light of *Naftalin* and *Meadows*, the Court denies Defendants' Motion to Dismiss based on the argument that Defendants are not offerors or sellers under section 17(a). The SEC does not merely allege that Defendants "signed" registration statements incorporating misstatements and omissions. The SEC alleges how Defendants were personally aware of and involved in the allegedly fraudulent schemes which promoted misstatements and omissions which became part of the materials offered to potential investors.

Materiality:

Section 10(b) of the Exchange Act ("Rule 10b-5"), makes it unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (2002). To state a claim under Rule 10b-5, a plaintiff must allege the following in connection with the sale or purchase of securities: (1) an omission or misstatement, (2) of a material fact, (3) made with scienter, (4) on which the plaintiff relied, (5) that proximately caused the plaintiff's injury. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 407 (2001). Rule 13b2-2 requires in part that "[n]o director or officers of an issuer shall directly or indirectly cause to be made a materially false or misleading statement to an accountant in connection with (i) any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or (ii) the preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise." 17 C.F.R. § 240.13b2-

2(a)(I-ii) (2005).[13]   Misrepresentations and omissions of fact are material if there is a substantial likelihood that the misstated or omitted facts would be reviewed by the reasonable investor as having significantly altered the 'total mix' of information available. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988).  Materiality depends on the significance the reasonable investor would have considered the alleged misstatements. *Id*. at 238-40.  The materiality standard requires a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable investor. *Justin Indus. v. Choctaw Sec., L.P.*, 920 F.2d 262, 267 (5th Cir.1990); *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 208 (5th Cir.1988) (citations omitted).

Defendants contend the sections 17(a) and 10(b) and Rule 13b2-2 claims fail because there are insufficient facts to support materiality in general.  SEC's materiality argument is that Defendants' wrongdoings resulted in the material overstatement of Fleming's earnings.  The Complaint details how Fleming represented its pre-tax income to allegedly inflate earnings.[14]  Defendants argue that Fleming's total revenue, not pre-tax earnings, is the appropriate benchmark for materiality.  Defendants argue that even if pre-tax earnings are the proper measurement, the misstatements are immaterial when measured against quarterly earnings in

---

[13] As previously stated, materiality is also a requirement under section 17(a)(2) (to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading).

[14] For instance, in the fourth quarter of 2001, Fleming had pre-tax earnings of approximately $26.9 million but vendor side letters and the release of accounting reserves totaled $27.05 million, which the SEC argues, if properly accounted for, would of resulted in a quarterly loss.  Similarly, Fleming reported annual 2001 pre-tax earnings of $62.8 million.  The SEC states if Fleming had properly accounted for the initiatives, Fleming's pre-tax earnings would have been only $35.7 million, a reduction in earnings of 43%.  In the first quarter of 2002, Defendants' initiatives totaled $18.43 million.  Fleming reported pre-tax earnings of $41.2 million for the first quarter.  Again, the SEC argues that if the initiatives were properly accounted for, Fleming's revenue would have been $22.7 million, a 44.5% difference.

the billions of dollars.

Defendants' also focus their materiality argument on the sections 17(a) and 10(b) claims pertaining to the July 11, 2002 S-4 offering ("Exchange Offering") arguing that failure to exchange promissory notes ("Old Notes"- which Fleming did not plan to register) in the Exchange Offering would subject the Old Note holders to excessive restrictions. Defendants argue that the alleged misstatements have no relevance in this context because no reasonable investor would strive to retain such restricted securities. The SEC argues that a reasonable investor would consider the misstatements material in this context because the notes were premised on misleading financial information.[15]

Most investors would consider it significant, no matter what mix of information is available, that a company is not earning as much as it is claiming to earn. In any event, materiality is a mixed question of law and fact. *S.E.C. v. Hoover*, 903 F.Supp. 1135, 1140 (S.D. Tex. 1995), *citing Sioux, Ltd., Sec. Litigation v. Coopers & Lybrand*, 914 F.2d 61, 65 (5th Cir. 1990). Therefore, the Court will not answer the question of materiality pursuant to a motion to dismiss. *See Barrie v. Intervoice-Bright, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005) (because accounting questions are disputed, dismissal is not appropriate).

Scienter

In securities fraud actions, Rule 9(b) requires a plaintiff to set forth specific facts that support an inference of fraud. *Tuchman,* 14 F.3d at 1068. Scienter is a mental state embracing

---

[15]The SEC points out that Defendants' Motion ignores the other two securities offerings which are also a basis for the Section 17(a) claim. (Pl.'s Compl. ¶ 119). The Complaint points out that the April 24, 2002 and the June 6, 2002 offerings incorporate the false and misleading financial statements, which were also signed by Shapiro.

intent to deceive, manipulate, or defraud. *Hochfelder*, 425 U.S. at 193.  Scienter may be established by showing intentional or severely reckless conduct. *Broad Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir.), *cert. denied*, 454 U.S. 965 (1981).  Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud, or (2) identify circumstances that indicate 'conscious behavior' on the part of the defendant. *Id*.  Under the conscious behavior standard, "the strength of the circumstantial evidence must be correspondingly greater" than the evidence required under the motive standard. *Tuchman*, 14 F.3d at 1068, *citing Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d. Cir. 1987), *cert. denied*, 484 U.S. 1005 (1988).  A defendant's omissions or misrepresentations are severely reckless only if they (1) involve an extreme departure from the standards of ordinary care, and (2) present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it. *Id*. at 961-62; *Shushany*, 992 F.2d at 521.  The nature of a restatement or violation may give rise to the inference of scienter. *See Haack v. MAX Internet Comms., Inc.*, 2002 WL 511514, n. 7 (N.D. Tex. 2002) (denying company's motion to dismiss fraud charges arising from revenue overstatements because the writing of revenue overstatements can support that defendants acted in a severely reckless manner).

  Defendants argue the sections 10(b) and 17(a)(1) claims lack allegations, without corresponding fraudulent intent, sufficient to establish scienter.  The SEC contends that the very nature of the these schemes attests to the fact that Defendants knew the proper accounting parameters and devised specific methods to circumvent them and conceal information from

14

internal and outside auditors. (Complaint ¶¶ 32, 35, 36, 54, 57, 77, 84).[16]

In *Tuchman*, shareholders brought an action for securities fraud against the corporation and its officers. To indicate conscious behavior, plaintiffs alleged that corporate officers made contradictory statements regarding the corporation's commitment to quality, the adequacy of the testing of corporate software, the reasons for corporate telephone network outages, and the reasons for the corporation's economic downturn. *Tuchman*, 14 F.3d at 1069. The court found these allegations inadequate to indicate conscious behavior because the complaint contained no assertion of any fact that makes it reasonable to believe that the defendants knew that any of their statements were materially false or misleading when made. *Id*. The SEC's complaint, on the other hand, does just that. The Court finds Defendants' statements and involvement in the various schemes previously discussed herein, if taken as true, suggest they acted in a reckless manner and were conscious of their wrongdoings.

The accounting issues in this case are undoubtedly voluminous and complex. However, claims will not be dismissed unless the plaintiff cannot prove any set of facts in support of its claim that would entitle it to relief. *EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase*, 467 F.3d 466 (5th Cir. 2006). The Court, in taking all facts pled as true, cannot say there is no basis for the SEC's claims. The strong inference pleading standard does not permit the Court dismiss the claims against Shapiro and Thatcher at this stage. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005).

## Recommendation

---

[16]*See* Statement of Financial Accounting Concepts No. 5, ¶¶ 83-84; the Staff Accounting Bulletin No. 101, Revenue Recognition in Financial Statements, Topic 13:A.3, Question 5. To the extent these letters were meant to reflect future advantages, the GAAP requires payments to be recognized over time, rather than upfront (Complaint ¶¶ 24, 25).

It is the Court's recommendation that Defendants' Motions to Dismiss under 9(b) and 12(b)(6) be DENIED.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 14th day of March, 2007.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE